**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| FELIX SEGOVIA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-11-0727 |
| | § | |
| MICHAEL ASTRUE, Commissioner | § | |
| of the Social Security Administration, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pretrial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Felix Segovia ("Plaintiff," "Segovia"), and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #12; Defendant's Cross-Motion for Summary Judgment and Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #9). Each party has filed a response to the competing motion. (Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #13; Defendant's Reply to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry #14). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be DENIED.

## Background

On November 16, 2007, Felix Segovia filed an application for Supplemental Security Income ("SSI") benefits, under Title XVI of the Social Security Act (the "Act"). (Transcript ["Tr."] at 129-34). In his application, Plaintiff claimed that he had been unable to work since January 1, 1997, due to epilepsy.[1] (Tr. at 129, 150). On appeal, he stated that he had since become depressed. (Tr. at 172). Segovia later added that he also suffers from "left knee problems," a hernia,[2] Hepatitis C,[3] and hypertension.[4] (Tr. at 14, 94). On January 14, 2008, the SSA denied his application for benefits, finding that he was not disabled under the Act. (Tr. at 82). Plaintiff petitioned for a reconsideration of that decision, but his claim was again denied, on March 24, 2008. (Tr. at 83).

On May 20, 2008, Plaintiff requested a hearing before an administrative law judge. (Tr. at 97-99). The hearing took place on September 3, 2008, before ALJ David J. Hebert. (Tr. at 24). Plaintiff appeared with his attorney, Donald Dewberry ("Dewberry"), and he testified in his own behalf. (*Id.*). The ALJ also heard testimony from Dr. Daniel Hamill, Ph.D. ("Dr. Hamill"), an expert, and Susan Rapant ("Rapant"), a vocational expert. (*Id.*). Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Segovia was capable of performing substantial gainful activity or was, in fact, disabled:

---

[1] The term "epilepsy" refers to "a group of neurologic disorders characterized by recurrent episodes of convulsive seizures, sensory disturbances, abnormal behavior, loss of consciousness, or all of these." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 575-76 (5th ed. 1998).

[2] A "hernia" is a "protrusion of an organ through an abnormal opening in the muscle wall of the cavity that surrounds it." *Id.* at 755.

[3] "Hepatitis C" is "an inflammatory condition of the liver" that is "transmitted largely by blood transfusion " or through self-injection. *Id.* at 752-53.

[4] "Hypertension" is "a common, often asymptomatic disorder characterized by elevated blood pressure" above a certain level. *Id.* at 794.

1.      An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.      An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007); *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). It is well-settled that, under this analysis, the claimant has the burden to prove any disability that is relevant to the first four steps. *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Wren*, 925 F.2d at 125. If he is successful, the burden then shifts to the Commissioner, at step five, to show that he is able to perform other work that exists in the national economy. *See Audler*, 501 F.3d at 448; *Perez*, 415 F.3d at 461; *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "'A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis.'" *Randall v. Astrue*, 570 F.3d 651, 652 (5th Cir. 2009) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)); *accord Audler*, 501 F.3d at 448.

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under

the Act has the burden to prove that he suffers from a disability.  *See Perez*, 415 F.3d at 461; *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).  A person is disabled only if he is "'unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'"  *Randall*, 570 F.3d at 653 (quoting 42 U.S.C. § 1382c(a)(3)(A)); *accord Perez*, 415 F.3d at 461.  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Id*.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Randall*, 570 F.3d at 657 (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that he "'is not only unable to do [his] previous work but cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work'" which exists in the national economy.  *Id*. (quoting 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence, the ALJ determined that Segovia suffers from a seizure disorder, major depressive disorder, "left knee problems," and a hernia, and that those impairments are "severe."  (Tr. at 14).  He concluded, however, that none of Segovia's impairments, or any combination of impairments, meets, or equals in severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations.  (Tr. at 15).  Next, the ALJ determined that Segovia has the residual functional capacity ("RFC") "to perform light work," with certain limitations.  (Tr. at 16).  And finally, the ALJ found that Segovia is capable of performing jobs that exist in sufficient numbers in the regional and national economies, such as

"office cleaner," "food production" worker, and "parking lot attendant." (Tr. at 18). With that finding, the ALJ concluded that Segovia "has not been under a disability, as defined in the Social Security Act, since November 16, 2007, the date the application [for SSI benefits] was filed," and he denied the application.[5] (Tr. at 19).

On July 30, 2009, Segovia requested a review of the ALJ's decision. (Tr. at 7). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; [or] (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On January 5, 2011, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed. (Tr. at 1-3). With this ruling, the ALJ's decision became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On February 28, 2011, Segovia filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge the Commissioner's decision. (*See* Plaintiff's Original Complaint, Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment. Having considered the pleadings, the evidence submitted, and the applicable law, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

---

[5] Regardless of the onset date of a disability, SSI benefits are not payable prior to "the month following the month [the claimant] filed the application." 20 C.F.R. § 416.335.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).  "If the Commissioner's findings are supported by substantial evidence, they must be affirmed."  *Id.*  "'Substantial evidence is more than a scintilla, less than a preponderance, and is such that a reasonable mind might accept it as adequate to support a conclusion.'"  *Randall*, 570 F.3d at 662 (*quoting Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992)); *accord Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Randall*, 570 F.3d at 662; *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000).  In making this determination, the court must weigh the following four factors:  the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his condition; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If there are no credible evidentiary choices or medical findings that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (quoting *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir. 2000)).

**Discussion**

Before this court, Segovia contends that the ALJ committed a number of errors.  (Plaintiff's Motion at 1).  He first claims that the ALJ "failed to adequately develop the record with regard to

6

Segovia's intellectual functioning." (*Id*.).  Next, Segovia contends that the ALJ "failed to properly evaluate the treating and examining physicians' opinions." (*Id*.).  He complains, as well, that the ALJ "failed to consider all of Segovia's impairments" in determining his residual functional capacity. (*Id*.).  And, finally, Segovia states that "[t]he vocational expert's testimony was in conflict with the Dictionary of Occupational Titles ["DOT"]," but the ALJ "failed to explain or resolve those conflicts." (*Id*.).  The Commissioner insists, however, that the ALJ properly considered all of the available and relevant evidence, and followed the applicable law, in determining that Segovia is not disabled.  (Defendant's Response at 2-11).

### *Medical Facts, Opinions, and Diagnoses*

From 1993 through 2007, Segovia was incarcerated in the Texas Department of Criminal Justice ("TDCJ") system, serving a 25-year sentence for theft.  (Tr. at 34).  The earliest medical records detail his treatment during his incarceration.  (Tr. at 232-308, 530-647).  On March 8, 2004, Segovia complained about umbilical pain.  (Tr. at 640).  It was determined to be muscle strain and a possible hernia.  (*Id*.).  On April 19, 2004, Segovia was treated with medication for his seizure disorder, but was reported to have suffered no seizures since his last appointment.  (Tr. at 636).  On July 6, 2004, Segovia went to the TDCJ clinic, complaining of "severe abdominal pain due to an umbilical hernia."  (Tr. at 627).  The hernia had grown, and was causing muscle spasms and pain on bending.  (*Id*.).  Segovia's pain was relieved by compression and use of an abdominal support binder.  (*Id*.).  On November 24, 2004, Segovia was scheduled to undergo hernia reduction surgery, but "refused to go because he had diarrhea."  (Tr. at 618).  From October 14, 2004, through April 21, 2005, Plaintiff was generally reported to be fully compliant with his medication regimen and to have little-to-no seizure activity.  (*See, e.g*.,Tr. at 245, 592, 614).  It was also reported that he was

suffering from an umbilical hernia, but that it was controlled with medication.  (Tr. at 251).

On January 26, 2005, Segovia complained of "abd[ominal] pain due to hernia."  (Tr. at 277).
The nurse noted that the hernia was "small" and "easily reducible."  (*Id.*).  She gave him a binder
to wear for abdominal support. (*Id.*).  On February 25, 2005, Segovia complained of "acute back
spasms," and was treated with medication.  (Tr. at 274).   An x-ray of his lumbar spine revealed
"[m]inimal osteoarthritic[6] changes of the lumbar vertebrae," "[o]therwise, the lumbar spine is within
normal limits."  (Tr. at 306).  On April 21, 2005, it was noted that Segovia was compliant with his
medications, and had not had any recent seizure activity.  (Tr. at 258).  On June 15, 2005, Segovia
was given a complete health evaluation.  (Tr. at 304).  He was observed to have no articular
problems with his skin, respiration, heart, stomach problems, "flank pain," neurological problems,
psychiatric concerns, or range of motion limitations in his upper and lower extremities.  (Tr. at 304-
05).  On September 28, 2005, clinic notes reveal that Segovia's hernia was "easily reducible," but
that he was "refusing surgery for hernia."  (Tr. at 290).  On October 10, 2005, Segovia complained
about numbness and tingling in his hands and feet, and reported that his extremities always felt cold.
(Tr. at 272).  Plaintiff was given some lab tests, but no particular condition was revealed.  (*Id.*).  At
a follow-up appointment, however, it was noted that these symptoms were signs of a "peripheral
vasoconstriction, *i.e.*, Raynaud's Syndrome."[7]  (Tr. at 278).  He was treated with medication.  (Tr.
at 278, 573).  On November 18, 2005, Segovia was seen for a follow-up appointment for Hepatitis

---

[6] "Osteoarthritis" is a disease "characterized by degeneration of the articular cartilage, hypertrophy of bone at
the margins, and change in the synovial membrane.  It is accompanied by pain, usually after prolonged activity, and
stiffness, particularly in the morning or with inactivity."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1286 (29th
ed. 2000).

[7] "Reynaud's" involves "intermittent attacks of ischemia of the extremities of the body, especially the fingers,
toes, ears, and nose, caused by exposure to cold or by emotional stimuli."  MOSBY'S at 1387.

C and his seizure disorder.  (Tr. at 239).  He was reported to have had no seizures in the past six months, and he continued to take medication for that condition.  (*Id*.).  He was noted to have no apparent symptoms of Hepatitis C.  (*Id*.).

On January 31, 2006, Segovia was treated for a seizure which had occurred the previous night, but it was noted that he suffered "no residual effects."  (Tr. at 566).  On April 18, 2006, Segovia reported suffering from seizures in his sleep, which resulted in "mild tongue and cheek biting."  (Tr. at 257).  A record dated May 3, 2006, showed that Segovia was fully compliant with his medication regimen, and that he reported "feel[ing] great."  (Tr. at 235).  On May 25, 2006, Segovia was observed to "feel fine" and to be "energetic."  (Tr. at 557).  On October 16, 2006, Segovia was found to be in "[n]o acute distress."  (Tr. at 248).  But he did report "having an unwitnessed seizure [the past] week."  (*Id*.).

On January 16, 2007, Segovia reported that he had been "having mild seizures [unwitnessed] because he is not on enough [anti-seizure medication]."  (Tr. at 245).  However, with medication, his seizures were under control.  (Tr. at 246).  It was also noted that Segovia's Hepatitis C was "inactive," and none of his medication was changed.  (*Id*.).  On January 25, 2007, Segovia was treated for a "burning sensation" in his right knee.  (Tr. at 548).  The problem was resolved before the follow-up office visit.  (*Id*.).  In February 2007, Segovia reported that he had suffered a seizure, but he was apparently refusing his medication unless it was given at night.  (Tr. at 242, 262, 547).  It was also noted that Plaintiff's Hepatitis C was "active," and that he suffered from pain in his right knee.  (Tr. at 262, 547).  His medications were changed.  (*Id*.).  On May 25, 2007, Segovia reported

that he had suffered a petit mal seizure[8] two nights before.  (Tr. at 242).  It was also reported that Segovia was not completely compliant with his medication, and that he refused to take medicine in the mornings.  (*Id.*).  He was ordered to continue with his medications.  (Tr. at 243).  During this period, Segovia was also treated for a "burning sensation" in his right knee.  (Tt. at 262).  The nurse observed no outward symptoms, such as crepitus[9] or unstable joints.  (Tr. at 263).  In July 2007, Segovia had a routine appointment, and had "no complaints."  (Tr. at 259, 307-08).  He was given a complete physical examination, which revealed no abnormalities except for the hernia.  (*Id.*).

From October 23, 2007, through April 2, 2008, Segovia was treated at the Casa de Amigos clinic.  (Tr. at 423-73).  The first record from the clinic, dated October 23, 2007, is a summary of Plaintiff's health history and of his current condition, by Dr. Zahida Siddiqi ("Dr. Siddiqi"), an internist.  (Tr. at 471-73).  Dr. Siddiqi observed that Segovia had been suffering from a seizure disorder since 1985, and had more recently been diagnosed with Hepatitis C, diverticulosis,[10] high blood pressure, and erectile dysfunction.  (Tr. at 471).  The report also detailed that Segovia had suffered a head injury in 1985, after which he underwent "nervous system surgery."  (*Id.*).  It further reveals that Segovia had surgery for "bilateral carpal tunnel syndrome" in 2000.  (*Id.*).  At the appointment, Segovia told Dr. Siddiqi that he would rate his overall health as a "5" on a scale of "1 to 10."  (Tr. at 472).  He stated that he had last had a seizure in August 2007.  (*Id.*).  Segovia told

---

[8]   "Petit mal seizure" is an "obsolescent term" for a type of cerebral seizure that is not manifested by the continuous, unremitting "contraction and relaxation of muscles in rapid succession."  STEDMAN'S MEDICAL DICTIONARY 364, 1615, 1843 (27th ed. 2000).

[9]   "Crepitus," or "crepitation," is a "[n]oise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions."  STEDMAN'S at 423-24.

[10]   "Diverticulosis" is "the presence of pouchlike herniations through the muscular layer of the colon, particularly the sigmoid colon."  MOSBY'S at 504.

Dr. Siddiqi that he was "worried, sad or depressed."  (Tr. at 473).  In another report, Dr. Siddiqi diagnosed Plaintiff as suffering from a seizure disorder, high blood pressure, a refraction disorder, and Hepatitis C.  (Tr. at 466).  She described him as "alert," "in no apparent distress," and "cooperative."  (Tr. at 465).  Segovia was seen again on December 5, 2007, and reported that he was suffering two to three seizures a day.  (Tr. at 464).  The doctor prescribed different seizure medication.  (*Id*.).  He returned on December 12, 2007, to be treated for abdominal pain.  (Tr. at 462-63).  His umbilical area was found to be tender.  (*Id*.).  The doctor ordered a CT scan[11] on Plaintiff's abdomen and pelvis.  (Tr. at 460).  The scan revealed "no acute abnormalities" of the abdomen and pelvis," "mild splenomegaly,"[12] and "sigmoid diverticulosis without diverticulitis."[13]  (*Id*.).

Records from January and February 2008 show that numerous laboratory tests were ordered by either Dr. Siddiqi or Dr. Patrick McCollister ("Dr. McCollister"), another internist.  (434-69).  A record dated January 14, 2008, reveals that Plaintiff had gone to the emergency room ("ER") the day before, presumably with complaints of abdominal pain.  (Tr. at 430).  Plaintiff reported having suffered a seizure following his ER visit, but it was noted that he was "out of [seizure medication] and was not given medication at ER."  (Tr. at 418, 430).  Segovia was observed to be "alert," "in no apparent distress," and "cooperative."  (Tr. at 431).  However, on January 14, 2008, Dr. Siddiqi checked a box on a form supplied by the Commissioner, indicating that she believed Plaintiff to be permanently disabled and unable to work because of his seizure disorder and Hepatitis C.  (Tr. at

---

[11] "CT" is an abbreviation for "computed tomography."  STEDMAN'S at 433.  A "tomography" is defined as a "radiographic image created with a curved motion of an x-ray tube or film cassette."  *Id*. at 1842.

[12] The term "splenomegaly" refers to "an abnormal enlargement of the spleen."  MOSBY'S at 1527.

[13] "Diverticulitis" is the "inflammation of one or more diverticula."  *Id*. at 503.  "Diverticula" is the plural form of diverticulum, which is "a pouchlike herniation through the muscular wall of a tubular organ."  *Id*. at 504.

369).  In an accompanying statement, Dr. Siddiqi stated that the primary reason for her conclusion was that Segovia "w[ould] get seizures if triggered by work."  (Tr. at 370).  Segovia saw Dr. Siddiqi again on April 2, 2008, for a follow-up appointment.  (Tr. at 426).

On September 27, 2010, Dr. McCollister completed a physical RFC questionnaire, at Segovia's request.[14]  (Tr. at 664-69).  Dr. McCollister reported that he had treated Plaintiff in 2008, and had diagnosed Segovia as suffering from cirrhosis[15] and a seizure disorder.  (Tr. at 664).  He also noted that Segovia's symptoms included "weakness, fatigue [and] convulsions," as well as chronic pain.  (Tr. at 664-65).  Dr. McCollister stated that the side effects from Segovia's medications included "drowsiness" and "dizziness."  (Tr. at 664).  Dr. McCollister also determined that Segovia was "incapable of [performing] even 'low stress' jobs."  (Tr. at 665).  He reported, however, that the severity of Segovia's "symptoms and functional limitations" were not exacerbated by "emotional factors."  (*Id*.).  Dr. McCollister found that Segovia's pain and other symptoms were severe enough to "constantly" interfere with the "attention and concentration needed to perform even simple work tasks."  (*Id*.).  He reported that Segovia could not walk an entire block without having to rest, that he could stand for only 10 minutes at a time, but that he could sit for at least six hours at a time.  (Tr. at 665-66).  Dr. McCollister found that Segovia could occasionally lift or carry items weighing 10 pounds, but could rarely lift or carry items weighing 20 pounds.  (Tr. at 666).  The doctor found that Segovia could only occasionally twist, stoop, or bend, and could rarely climb ladders or stairs.  (Tr. at 667).  Dr. McCollister wrote that, on average, Segovia would have to be absent from work more than four days per month because of his impairments.  (*Id*.).  He concluded his report with the

---

[14] This evidence is dated more than one year after the ALJ's decision.

[15] "Cirrhosis" is "a chronic degenerative disease of the liver."  MOSBY'S at 344.

following comments about Plaintiff's condition:

> Felix Segovia is a 53 y.o. male with Hepatitis C.  His serum ammonia level is elevated.  He has a poorly controlled convulsive disorder related to head trauma.  His hepatic encephalopathy[16] has limited his ability to concentrate.  He meets the Blue Book criteria for disability under the hepatic encephalopathy division under liver diseases.

(Tr. at 669).

From November 5, 2007, through December 14, 2007, Segovia was evaluated at Ben Taub hospital to determine whether he should undergo surgery to reduce the size of his hernia.  (Tr. at 310).  Initially, surgery was recommended, but Plaintiff signed a "refusal of treatment."  (Tr. at 326).  The records show that, on November 27, 2007, Segovia stayed at the Star of Hope shelter.  (Tr. at 347).  On December 5, 2007, a companion called for an ambulance because Segovia had suffered a seizure.  (Tr. at 337).  The ambulance took him to Ben Taub, and the records showed that his condition improved on the way to the hospital.  (Tr. at 338).

From January 16, 2008, through May 27, 2008, Plaintiff was treated at MHMRA of Harris County, on an outpatient basis.  (Tr. at 382-88, 474-529).  On January 16, 2008, Plaintiff went to MHMRA, complaining of depression, as shown on the initial report:

> 51 yr [Hispanic male] wanting meds for depression.  Pt was in prison for 14yrs, released three months ago and now living in a shelter for past one week--Turning Point.  Pt c/o depressed mood, poor sleep ..., weight loss, and feeling helpless.

(Tr. at 529).  He was examined by Dr. Madhuri Kamble ("Dr. Kamble"), a psychiatrist, who diagnosed him as suffering from a major depressive disorder, single episode.  (*Id*.).  Dr. Kamble prescribed an anti-depressant medication, and rated Segovia's Global Assessment of Functioning

---

[16] The term "encephalopathy" refers to "any abnormal condition of the structure or function of brain tissues, especially chronic, destructive, or degenerative conditions."  *Id*. at 558.

("GAF") score as 45.[17]  (Tr. at 527).

The records show that Segovia was seen at MHMRA again on January 18, 2008, by Edgar Pagan ("Mr. Pagan"), a qualified mental health professional.  (Tr. at 522).  Mr. Pagan recommended MHMRA's lowest level of care, "Service Package 1," which "include[d] medication services and assignment to a clinical caseworker who will assist with coordination of services and may provide basic skills training as needed."  (Tr. at 521).  On February 6, 2008, Segovia underwent a psychiatric assessment and examination by Dr. Hugh Pharies ("Dr. Pharies"), a psychiatrist, who noted that Plaintiff's mood was "depressed."  (Tr. at 382-88, 519-20).  A note on that record reports no past history of psychiatric problems.  (*Id*.).  Dr. Pharies also observed that Segovia was experiencing insomnia, but that he was alert; cooperative; had normal motor activity; had normal speech; and had an appropriate affect.  (Tr. at 383-88, 519).  He found, as well, that Segovia's thought process was "goal directed"; that his insight and judgment were "fair"; and that his cognitive process was "grossly intact."  (*Id*.).  Dr. Pharies reported, however, that Segovia complained that his memory and concentration ability had decreased in the past year.  (Tr. at 513).  Dr. Pharies diagnosed Plaintiff as suffering from "major depression, single episode, severe without psychotic factors."  (Tr. at 385).  He prescribed an anti-depressant medication.  (*Id*.).  While it is difficult to decipher, it appears that the doctor also found that Plaintiff suffers from "antisocial conduct disorder," and he rated Segovia's GAF as "43."  (Tr. at 385, 518).

A record dated February 19, 2008, shows that Plaintiff did not appear for his scheduled

---

[17] The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status.  *See id*.  A GAF of 41-50 indicates "serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)."  *Id*. at 34.

appointment, and he did not contact MHMRA.  (Tr. at 506-07).  Apparently, he failed to make at least one more appointment, as well.  (*Id*.).  Plaintiff was next seen at MHMRA on March 3, 2008, for a regular counseling session.  (Tr. at 503).  On March 12, 2008, Segovia was seen by Dr. Pharies, who noted that Segovia was not showing improvement.  (Tr. at 500).  Further, Segovia told Dr. Pharies that he stopped taking his insomnia medication, because it was "not helping him sleep," and he had stopped taking the anti-depressant because it "caused him to develop sores 'like a spider bite.'"  (*Id*.).  He was instructed to follow his medication regimen as prescribed.  (Tr. at 499).  At his following appointments at MHMRA, Segovia began to show improvement.  (478-98).  On April 24, 2008, he informed the staff at MHMRA that he had moved out of the shelter and into his own apartment.  (Tr. at 494).  On May 5, 2008, Segovia reported that his "med[ication]s are working well in suppressing his symptoms," and that he was taking them as prescribed.  (Tr. at 491).  He also stated that "his sleep pattern ha[d] improved."  (Tr. at 482).  However, he continued to complain that his memory and concentration were deficient.  (Tr. at 488).  On May 21, 2008, Dr. Pharies found that there was "no indication pt needs continued t[reatment]."  (Tr. at 479).  On that day, however, Segovia said that he had stopped taking his "psych meds," explaining, "I feel great."  (Tr. at 478). Segovia was discharged from the MHMRA program on May 27, 2008, by mutual consent, because all "goals [were] reached."  (Tr. at 475).  It was noted that Plaintiff's mental condition had improved, and that he "reports an improvement in his depressive symptoms."  (*Id*.).

March 18, 2008, Plaintiff was examined by Dr. Jodie Lynn Paterson ("Dr. Paterson"), a psychologist, on behalf of the state.  (Tr. at 391).  Dr. Paterson observed that Segovia had a flat affect.  (Tr. at 395).  She found his thought processes to be "logical and coherent," his immediate memory to be "deficient," his recent memory to be "fair," and his memory for remote events to be

"fairly intact." (Tr. at 395-96). She further rated his concentration, abstract thinking, insight, and judgment to be "fair." (Tr. at 396). Dr. Paterson diagnosed Segovia as suffering from "major depression, recurrent, severe without psychotic features." (*Id.*). Dr. Paterson commented that Segovia's intelligence might be in the borderline range, and she rated his GAF as 50. (*Id.*).

On March 20, 2008, Dr. Leela Reddy ("Dr. Reddy"), a psychiatrist, completed a psychiatric review technique form ("PRTF") and mental RFC assessment on behalf of the state, presumably based on Dr. Paterson's examination. (Tr. at 397-410, 419-22). On the PRTF, Dr. Reddy considered whether Segovia's mental condition satisfied Listing 12.04 for affective disorders. (Tr. at 397-400). She found that Segovia was suffering from major depressive disorder, "[a] medically determinable impairment [that] is present that does not precisely satisfy the diagnostic criteria." (Tr. at 400). Dr. Reddy found that Segovia was mildly limited in activities of daily living, and moderately limited in maintaining "social functioning," and "concentration, persistence, or pace." (Tr. at 407). Dr. Reddy concluded that Segovia's "[a]lleged limitations are partially supported by evidence in [the] file." (Tr. at 409). On the mental RFC assessment form, Dr. Reddy found that Segovia was "moderately limited" in his ability to understand, remember, and carry out detailed instructions. (Tr. at 419). She also determined that Plaintiff was "moderately limited" in "the ability to maintain attention and concentration for extended periods." (*Id.*). She further found that Plaintiff was "moderately limited" in "the ability to complete a normal workday and workweek" without significant psychological interruptions, and in "the ability to respond appropriately to changes in the work setting." (*Id.*). Dr. Reddy reported that Segovia was "not significantly limited" in all other aspects of "understanding and memory," "sustained concentration and persistence," "social interaction," and "adaptation."

16

(*Id.*).  In sum, Dr. Reddy reached the following conclusion:

> Claimant can understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting[s].

(Tr. at 421).

On March 24, 2008, Dr. Moira Dolan ("Dr. Dolan"), an internist, completed a physical RFC assessment on behalf of the state.  (Tr. at 411-18).  Dr. Dolan identified Plaintiff's primary diagnosis as a "seizure disorder," and the secondary diagnosis as "umbilical/inguinal hernias."  (Tr. at 411). Dr. Dolan found that Segovia could occasionally lift or carry objects weighing up to 20 pounds and frequently lift or carry 10-pound objects; he could push or pull with only those weight limitations; and he could stand, walk, or sit for 6 hours in an 8-hour workday.  (Tr. at 412).  She also determined that Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  (Tr. at 413).  However, she stated that Segovia "should avoid [climbing] ladder/rope/scaffolds secondary to seizure disorder."  (*Id.*).  Dr. Dolan found that Segovia had no manipulative, visual, or communicative limitations.  (Tr. at 414-15).  Dr. Dolan also found that he had no environmental limitations except "avoid[ing] all hazards in the workplace including machinery, heights, etc. due to seizure disorder."  (Tr. at 415).  Dr. Dolan determined that the "alleged limitations are not wholly supported by evidence in file."  (Tr. at 416).  She elaborated, as follows:

> [Medical evidence of record] indicates that when claimant is consistently compliant with seizure medication, seizures are well controlled.  Since being discharged from TDCJ, [claimant] has been inconsistent in taking medication and frequency of seizures have increased.  Labs show [claimant's] antiseizure [medications] levels consistently low.

(*Id.*).  Dr. Dolan also stated that Segovia "does not have any end organ damage secondary to hypertension."  (*Id.*).  As a final matter, Dr. Dolan explained that she did not agree with the

conclusions of Segovia's treating source:

> [Treating source] noted that claimant is completely disabled due to seizure [disorder]. States work will trigger seizures. Medical evidence does not support this conclusion. TDCJ notes indicate that [claimant] was given some work restrictions -- no prolonged walking, no lifting greater than 50 lbs, no work assignment where sudden loss of consciousness would be dangerous -- but beside[] restrictions [he] was able to work despite seizures [with] no indication that seizures were triggered when he did.

(Tr. at 417).

In addition to medical records, the administrative transcript includes records from the schools Plaintiff attended, as a child, within the San Antonio Independent School District. (Tr. at 197-204). The earliest of these records reflects Segovia's progress in elementary school, from 1963 through 1969. (Tr. at 198). Segovia earned C, D, and F grades in most of his subjects. (*Id.*). Another record, dated 1971, shows that Plaintiff did poorly on the "Metropolitan Achievement Test" while in junior high school. (Tr. at 199). Other records from that period show that Segovia regularly received C, D, and F grades, except in physical education. (Tr. at 199-201).

### Educational Background, Work History, and Present Age

At the time of the hearing, Plaintiff was 52 years old. (Tr. at 32). Segovia has a tenth-grade education, and no past relevant work experience. (Tr. at 17-18, 33).

### Subjective Complaints

In his application for benefits, Segovia claimed that he had been disabled, and unable to work, since January 1, 1997, due to "epilepsy." (Tr. at 145, 150). Segovia also completed a Daily Activity Questionnaire. (Tr. at 156-58). On that questionnaire, Segovia stated that, when he loses consciousness because of a seizure, "it takes some time to regain [his] memory back plus [his] while body goes limp and [he has] a hard time in seeing [sic]." (Tr. at 156). He claimed that recently he

had been having seizures "every few days," and had been taken to the emergency room after his most recent seizure. (*Id*.). He added that his condition was "getting out of hand," that he was feeling a lot of stress, and that he sometimes felt very hopeless. (Tr. at 158). Segovia wrote that he had difficulty standing, walking, lifting, carrying, and climbing because those activities might "cause loss of consciousness." (Tr. at 157). He also stated that, after a seizure, he had "difficulty speaking." (*Id*.). Finally, he complained that either a lack of strength or pain made it difficult for him to bend, kneel, or do yard work. (*Id*.).

Segovia updated his SSI application on appeal, reporting that he was also suffering from depression, high blood pressure, and lower back pain. (Tr. at 171, 191). He also stated, "I am depressed and I had thoughts of suicide, I can't think right." (Tr. at 172). He further reported that he had been prescribed a larger dosage of seizure medication, because he was suffering from so many episodes. (*Id*.). Finally, Segovia noted that he had high blood pressure and an umbilical hernia. (Tr. at 174-76). For the appeal, Plaintiff also completed two Daily Activity Questionnaires, and complained that he was suffering from depression, stress, memory problems, and dizziness. (Tr. at 178-85).

At the hearing before the ALJ, Segovia testified that he has suffered from seizures since 1985, but that they are controlled by medication. (Tr. at 36-37, 53-54). He explained to the ALJ that he suffered a head injury in 1985, and was hospitalized as a result. (Tr. at 37-38). Plaintiff testified that he underwent surgery on his left knee in 1994, but has had no problems with that knee since that time, except when he walks for a long while. (Tr. at 38, 54). Segovia testified that he developed carpal tunnel syndrome in his left hand and underwent surgery for that, yet he still has difficulty picking up objects with his left hand. (Tr. at 38-39). He did tell the ALJ, however, that

he is right handed.  (Tr. at 39).  Segovia further testified that he suffers from back pain, and that he experiences this pain most often after sitting for "an hour or so."  (Tr. at 39-40).  Segovia testified that he has Hepatitis C, but that it is "under control."  (Tr. at 40).

Segovia also testified that he has a hernia, located near his "belly button."  (*Id*.).  He testified that, as early as 2005, doctors had recommended hernia surgery, and that he could have undergone the surgical procedure while in jail, but he refused to do so.  (*Id*.).  Segovia testified that he was scheduled to have the hernia examined again within a month of the hearing.  (Tr. at 40-41).  Segovia told the ALJ that, because of the hernia, he has difficulty bending over and lifting things without pain or discomfort.  (Tr. at 41, 56).  He described the pain as an "8" on a 10-point scale.  (Tr. at 56).  Segovia testified that he has high blood pressure, but that it is "under control."  (Tr. at 41).  Plaintiff also testified that his medications make him drowsy, so that once a day he has to lie down and get some sleep.  (Tr. at 45-47).

Segovia testified that he has memory problems, and gave, as an example, "Like if I need to go somewhere or where I place my stuff, my keys."  (Tr. at 45).  Segovia testified that he is under the care of a psychiatrist, and he believes that he is depressed.  (Tr. at 42).

Segovia testified that he was convicted of theft on June 15, 1993, and sentenced to 25 years' imprisonment.  (Tr. at 34).  He testified that he served 14 years in prison, and was then released on parole, on October 18, 2007.  (*Id*.).  He is scheduled to be on parole through 2018.  (*Id*.).  Segovia also testified that he is a drug addict and, in the past, was addicted to heroin for ten years.  (Tr. at 35-36).  He told the ALJ that he had not used illegal drugs since his release from prison.  (*Id*.).  Segovia further testified that he was addicted to alcohol, but added that he had been sober since 1993.  (Tr. at 36).

20

Segovia testified that he has nine children, the youngest of whom was fourteen at the time of the hearing.[18]  (Tr. at 34).  He testified that he has difficulty "associating" with people, has no friends, and does not date.  (Tr. at 42).  Segovia testified that, approximately two months prior to the hearing, he signed up with Department of Assistive & Rehabilitative Services ("DARS"), a program to help the disabled find work and improve their lives.[19]  (Tr. at 44).  Segovia explained that he had to seek employment as a condition of his parole.  (Tr. at 50).  Segovia testified that he was currently working as a custodian at a funeral home.  (Tr. at 44-45).  He testified that he knew his job, and did not have to be reminded of what to do.  (Tr. at 72).  Segovia told the ALJ that he worked at his job fifteen hours a week.  (Tr. at 45).  He also testified that he had attempted to work there on a full-time basis, but could not because his medication makes him drowsy and he has to lie down "for an hour or two." (*Id.*).  He testified, however, that his superior was satisfied with his work.  (Tr. at 72).  And he told the ALJ that DARS hoped to get him a job as a custodian for an apartment complex, and that that position may be full time.  (Tr. at 52).

Plaintiff testified that he lives alone, and that he leaves the house approximately four times a week to go to work or to "town."  (Tr. at 42, 49).  He told the ALJ that he does not have a driver's license, but that he takes public transportation.  (Tr. at 42).  Plaintiff told the ALJ that, between his incarceration and his current home, he has lived in halfway houses.  (*Id.*).  He testified that he typically goes to bed at 10:00 p.m., and gets out of bed at 4:00 a.m.  (Tr. at 46).  He stated, however, that he has difficulty sleeping, and only sleeps for an average of four hours each night.  (*Id.*).  Segovia testified that, when he gets out of bed, he watches television and then gets ready for work.

---

[18] Comments in the MHMRA medical records suggest that Segovia is not in touch with any family members. (Tr. at 382-88, 474-529).

[19] *See http://www.dars.state.tx.us/about/index.shtml.*

(*Id*.).  He testified that he cooks for himself.  When the ALJ asked him, "What do you plan on doing

with the rest of your life," Segovia replied, "I hope to get a permanent job."  (Tr. at 48).

### Expert Testimony

At the hearing, the ALJ also heard from Dr. Daniel Hamill, a clinical psychologist, who

based his opinion on the evidence in the record and the hearing testimony.  (Tr. at 58).  Dr. Hamill

testified that Segovia suffers from a recurrent major depressive disorder, but that he did not believe

that the condition met or equaled the requirements for any of the listed mental impairments.  (Tr. at

60-61).  Dr. Hamill stated, "[t]here at least seems to be a good medication response per the most

recent treatment records," but that, currently, no one appeared to be treating Plaintiff for depression.

(Tr. at 61).  Dr. Hamill then testified about Segovia's mental RFC:

> With the apparent recurrence of some level of depression, I would propose
> what I usually call a low stress RFC.
>
> Typically I would limit such an individual to one, two, three step simple
> repetitive tasks.  That would preclude any kind of detailed or complex work.  I would
> preclude any kind of assembly line or forced pace task.
> *   *   *
> And largely listening to testimony, I would limit contact with the general
> public and co-workers to occasional in nature.

(Tr. at 62).  He testified that nothing in the record suggested that Plaintiff would have difficulty

interacting with supervisors.  (Tr. at 62-63).

Plaintiff's attorney then took the opportunity to pose questions to the expert witness based

on Segovia's school records.  (Tr. at 63).  Dr. Hamill testified that the records labeled "Test

Records," "No. 1, Intelligence Test, Elementary and Secondary" are not from an actual intelligence

test, but from a standardized test called the "Metropolitan Achievement Test" that was given to

Segovia in 1971, when he was fourteen years old.  (Tr. at 63-64).  The results of that test showed

that Segovia was performing three to four grades below his current grade in standard academic areas. (Tr. at 65-66). Dr. Hamill testified that he could only conclude from those results that Segovia was not doing very well in school, for unknown reasons that could be based on intelligence but may not have been. (Tr. at 66-67). He told Plaintiff's attorney that "[y]ou cannot evaluate IQ based on these tests." (Tr. at 67). Dr. Hamill also testified that the medical records contained no findings about Plaintiff's intelligence quotient.[20] (Tr. at 68).

Finally, the ALJ heard from Susan Rapant, a vocational expert. (Tr. at 71). Ms. Rapant testified that Plaintiff had no past relevant work experience. (Tr. at 73). The ALJ then posed a hypothetical question to the expert witness:

> Q      I want you to assume for my first hypo that the individual of the same age and education as Claimant with no past work experience and ... no exertional limitations, but that this Claimant can only occasionally climb ladders and ropes and scaffolds, should not have jobs requiring balance or working at heights.
>
> This individual can understand, carry out and remember simple one, two and three step routine, repetitive type tasks, but cannot do detailed or complex tasks. This individual should only have low stress type jobs with no assembly line or fast-paced work and is limited to occasional work dealing with the public and relating to co-workers.
>
> *      *      *
>
> With those assumptions, in your opinion would there be any jobs in the regional or national economy for such a person?
>
> A      Yes, Your Honor. There would be medium, unskilled work.

(Tr. at 74-75). She gave examples of such jobs that exist in significant numbers, including "hospital cleaner," "car detailer," and "industrial cleaner." (Tr. at 75). The ALJ posed a second hypothetical

---

[20] Following the hearing, on January 8, 2009, Dr. Hamill was asked to review additional medical records from TDCJ. (Tr. at 657-62). After reviewing them, he answered a set of interrogatories. (*See id.*). Dr. Hamill stated that none of the records pertained to his area of expertise. (Tr. at 659). He then reported that those TDCJ records provided "no evidentiary basis for [him] to amend [his] testimony in this matter." (*Id.*).

question, as follows:

> Q        ...Now, as a second hypothet[ical] I'd like you to make all the assumptions
> that we made in that first one and add to it, okay?
>
> This time besides the assumptions from the first hypothet[ical] assume that
> the individual could work at the light exertional level; that is to say could lift and
> carry occasionally 20 pounds and frequently 10, could stand and walk six hours in
> a normal workday with normal breaks and sit six hours.  All the rest of the
> assumptions are the same.
>
> Now, in your opinion would there be any jobs in the regional and national
> economy for such a person?
>
> A        Yes, Your Honor.

(Tr. at 75-76).  Rapant identified those positions as "delivery driver," "office cleaner," and "food

production worker."  (Tr. at 76).  The ALJ then asked:

> Q        With that second hypothet[ical], if I were to add to that that the individual
> could not have any jobs requiring driving I know the delivery driver job may not be
> doable then, but the other two jobs would he still [be able to] do?
>
> A        Yes, Your Honor.
>
> Q        Would there be any example you can give me that did not require driving?
>
> A        Yes.  A parking lot attendant.

(Tr. at 76-77).

Plaintiff's attorney also posed a hypothetical question to the vocational expert witness, as

follows:

> Q        Ms. Rapant, assume with me that the hypothetical individual would have to
> lay down one hour during the normal eight hour workday beyond the normal three
> breaks that the hypothetical individual would receive. Would there be any jobs in the
> national economy such an individual could perform?
>
> A        I don't believe most employers would tolerate that type of break on a regular
> basis, so I would say no.

24

(Tr. at 77).

       With that, the ALJ concluded the hearing.

### *The ALJ's Decision*

       Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he found that Segovia suffers from a seizure disorder, major depressive disorder, "left knee problems," and a hernia, and that those impairments are "severe."  (Tr. at 14).  He concluded, however, that none of Segovia's impairments, or any combination of impairments, meets, or equals in severity, the medical criteria for any disabling impairment listed in the applicable SSA regulations.  (Tr. at 15).  The ALJ also found that, generally, Segovia had the residual functional capacity to perform "light work."  (Tr. at 16).  However, he qualified that finding in the following manner:

> [Segovia can] stand and walk six hours of an eight-hour workday; sit six hours of an eight-hour workday; lift and carry 10 pounds frequently and 20 pounds occasionally; never balance or work at unprotected heights; and only occasionally climb ropes or ladders.  He can understand, remember and carry out simple 1-2-3 step routine, repetitive tasks.  He can deal with low stress jobs, but not with assembly line or forced pace jobs.  He can have occasional contact with the general public and co-workers.

(*Id.*).  Further, based on the testimony from the vocational expert, the ALJ found that Segovia can perform the following, available jobs: "office cleaner"; "food production"; and "parking lot attendant."  (Tr. at 18).  The ALJ ultimately concluded that Segovia is not disabled, and he denied his application for SSI.  (Tr. at 18-19).  That denial prompted Plaintiff's request for judicial review.

       It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it.  *See Randall*, 570 F.3d at 655; *Newton*, 209 F.3d at 452 (citing

*Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id*.  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Boyd*, 239 F.3d at 704.

### Intellectual Functioning

Plaintiff's primary complaint is that the ALJ erred by "fail[ing] to adequately develop the record with regard to Segovia's intellectual functioning."  (Plaintiff's Motion at 1).  He claims, in particular, that the ALJ should have granted his attorney's request, at the hearing, for an IQ test.  (Plaintiff's Response at 1; *see* Tr. at 80).  Plaintiff argues that, because the record was not properly developed, the ALJ's decision is not "an informed decision based on sufficient facts."  (Plaintiff's Motion at 6).

As a general rule, in determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts."  *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)).  If he fails to do so, his decision is not supported by substantial evidence, and it is subject to reversal if the error results in prejudice to the claimant.  *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557.  "The ALJ's duty to undertake a full inquiry, however, 'does not require a consultative examination at government expense unless the record establishes that such an examination is necessary to enable the administrative law judge to make the disability decision.'"  *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (quoting *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)).

In this case, the claimant's intellectual capacity was never at issue.  First, as the Commissioner points out, there is no mention of intellectual dysfunction in Segovia's SSI

application. (*See* Defendant's Response at 3). Indeed, the issue appears to have been raised for the first time at the hearing, when Mr. Dewberry presented Dr. Hamill with a copy of Segovia's school records, and asked how they related to Plaintiff's intelligence. (*Id*.; Tr. at 63-68). In *Pierre v. Sullivan*, the Fifth Circuit cited a claimant's failure to list intelligence problems when applying for benefits as a sign that the issue was not properly before the ALJ. *See* 884 F.2d at 802. Next, contrary to Dewberry's claims, the administrative record does not contain significant evidence that Segovia has limited intelligence. (*See* Plaintiff's Motion at 6; Defendant's Response at 2-3). For instance, Dr. Hamill testified that the school records were not evidence of Segovia's intelligence, because (i) none of the records shows the results of an intelligence test; and (ii) poor performance in school can result from a number of factors that have nothing to do with intelligence. (Tr. at 63-68). Also, the school records are more than forty years old, and Segovia testified that he was never placed in special education classes. (Tr. at 79-80). In addition, the medical records that address Plaintiff's mental state concern non-intellectual factors, including feeling worried and depressed; difficulty in certain areas of concentration and memory; moderate limitation in the ability to handle complex instructions; and difficulty maintaining social relationships. (*See, e.g*., Tr. at 395-96 [Dr. Paterson]; 407-09, 419-21 [Dr. Reddy]; 473 [Dr. Siddiqi]; 513, 519 [Dr. Pharies]; 527-29 [Dr. Kamble]). Other medical records also show that Plaintiff's GAF lay within the range of 41-50, at the time of his appointments. (Tr. at 396 [Dr. Paterson]; 518 [Dr. Pharies]; 527 [Dr. Kamble]). But the GAF scale measures an individual's "overall psychological functioning," and, more specifically, "social or occupational functioning," as opposed to "intellectual functioning." *See Boyd*, 239 F.3d at 707; DSM-IV at 32-34. It follows that a low-range GAF score is not evidence of low-range intelligence. *See id*. Plaintiff points out that Dr. Paterson commented that Segovia might have

27

borderline intelligence.  (Plaintiff's Motion at 2).  But, as a rule, "isolated comments about the limits of [a claimant's] intellectual functioning" are not sufficient to invoke the ALJ's duty to develop the record.  *See Pierre*, 884 F.2d at 802-03; *accord Domingue v. Barnhart*, 388 F.3d 462, 463 (5th Cir. 2004); *Brock*, 84 F.3d at 728.  Further, despite her comment on his intelligence, Dr. Paterson found that Segovia's "recent memory," memory for remote events, concentration, abstract thinking, insight, and judgment were "fair."  (Tr. at 395-96).  Notably, nowhere in the medical records does a professional recommend that Segovia undergo intelligence testing, or suggest that his level of intelligence is problematic.

In sum, the issue of Plaintiff's "intellectual functioning" was not properly before the ALJ. *See Pierre*, 884 F.3d at 803.  There is no significant evidence that Segovia suffers from intelligence problems.  And nothing in the record suggests that further development of the record, including an IQ test at the government's expense, is necessary for the ALJ to make an informed decision.  *See id.*; *Brock*, 84 F.3d at 728.  For these reasons, the duty to develop the record was not invoked, and the ALJ committed no error in failing to do so.

### *Treating Physicians*

Plaintiff also argues that the ALJ erred by "fail[ing] to properly evaluate the treating and examining physicians' opinions."  (Plaintiff's Motion at 1).  In particular, he claims that the ALJ failed to properly evaluate the opinions from Dr. Zahida Siddiqi and Dr. Jodie Paterson.  (*Id*. at 3, 8-9).  The law is clear that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons to do so.  *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Newton*, 209 F.3d at 453.  Indeed, the Fifth Circuit has repeatedly held that, as a rule, "the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries,

treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621.  It is also true, however, that, "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician" when he has good cause to do so. *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)).

At the outset, as Defendant points out, "it is highly debatable whether Dr. Siddiqi even qualifie[s] as a treating physician under the Commissioner's regulations, as [s]he apparently only saw Plaintiff on two occasions." (Defendant's Response at 3; *see* Tr. 369-70).  Under the regulations, the "[l]ength of the treatment relationship and the frequency of examination" factor significantly in determining the weight to give a physician's opinion.  20 C.F.R. § 416.927(d)(2)(i). In this case, there is no evidence that Dr. Siddiqi treated Segovia on a regular basis.  (*See* Tr. at 369-70).  For that reason, her opinions are entitled to less deference.  *See* 20 C.F.R. § 416.927(d)(2)(i).

Further, the ALJ found expressly that "the record does not contain any opinions from treating or examining physicians indicating that the claimant ... has limitations greater than those determined by this decision."  (Tr. at 17).  While it would have been more in keeping with the regulations had he specifically identified and discussed Dr. Siddiqi's opinions, the ALJ's finding is supported by substantial evidence, and shows that he had good cause to reject those opinions.  *See Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 453; *Bradley*, 809 F.2d at 1057.  Indeed, Dr. Siddiqi's only comments about the extent of Segovia's disabilities are on a form drafted by the state, on which the doctor marked the lines next to pre-printed findings that "[t]he disability is permanent," and that the patient

was "[c]ompletely disabled (patient's diagnosis is too chronic for employability)."  (Tr. at 369-70).

Dr. Siddiqi explained that she believed Plaintiff to be disabled because of his seizure disorder and

Hepatitis C, and due to her concern that Segovia "[w]ould get seizures if triggered by work."  (Tr.

at 370).  Her opinions are conclusory, as she identifies no medical evidence that supports them.  An

ALJ may discount a treating physician's opinion when it is conclusory.  *See Shave v. Afpel*, 238 F.3d

592, 595 (5th Cir. 2001).  In addition, the ALJ's decision accounted for Dr. Siddiqi's concerns about

seizures, because he imposed restrictions recommended for those with a seizure disorder.  (Tr. at 16-

17).  Further, there is ample evidence in the record that Segovia's seizure disorder is well-controlled

by medication, and that he rarely suffers from symptoms related to Hepatitis C.  (*See, e.g.*, Tr. at

235, 239, 245-46, 592, 614 [TDCJ]; 416-17 [Dr. Dolan]; 431 [Casa De Amigos clinic]).  In fact, Dr.

Dolan expressed her disagreement with Dr. Siddiqi, stating that her opinions were not based on

medical evidence, and were contradicted by such factors as Plaintiff's history of working in prison,

with seizure precautions, and the fact that he had apparently never suffered a seizure at work.  (Tr.

at 417).  Plaintiff also complains that the ALJ "failed to give proper weight to the opinion of the

consulting psychologist, Dr. Paterson," who allegedly "implicitly opined that Segovia was unable

to work" when she assigned him a GAF score of "50."  (Plaintiff's Motion at 9).  However, a GAF

score within the range of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe

obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school

functioning (e.g., no friends, unable to keep a job)."  DSM-IV at 34; *accord Boyd*, 239 F.3d at 702.

By definition, then, a GAF score of 50 does not necessarily mean that a claimant is "unable to keep

a job."  *See* DSM-IV at 34.  Accordingly, Dr. Paterson's finding that Plaintiff's GAF score was "50"

does not equate to a finding that he cannot engage in some light work.  *See id*. Moreover, the ALJ

noted in his decision that Plaintiff's disability allegations are belied by Segovia's testimony that he has worked, that he was currently employed, and that he was actively seeking additional employment through the DARS program. (Tr. at 17). An ALJ may reject a treating physician's statement that the claimant cannot work when the evidence shows that the claimant has been working. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994). Finally, in his written decision, the ALJ made the following comment on the lack of evidence in the record:

> Given the claimant's allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on the claimant by the treating physician, yet a review of the record in this case reveals no restrictions recommended by the treating physician.

(Tr. at 17).

In this case, then, it appears that the ALJ adequately considered the findings by the treating and examining physicians. The only evidence which might weigh in favor of a finding that Plaintiff is completely disabled  is Dr. Siddiqi's opinion, but that is not supported by the other evidence in the record. In fact, it seems unreasonable to conclude that Plaintiff cannot work due to the risk of seizure, given the evidence that his seizure disorder was under control, and that anti-seizure precautions were put into place. Here, Dr. Siddiqi appears to be "leaning over backwards to support [Segovia's] application for disability benefits," and, in light of the other evidence in the record, the ALJ was free to reject her conclusions. *See Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). Beyond that, the ALJ appears to have given proper weight to the opinions by the treating and examining medical professionals, as he addresses them, albeit not always by name, and provides detailed and well-supported reasons for his conclusions. *See Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 453. Under these circumstances, the ALJ did not err in his treatment of the opinions of Segovia's treating and examining physicians.

31

### *Taking All Impairments into Account*

Plaintiff further complains that the ALJ erred by "fail[ing] to consider all of Segovia's impairments" in determining his residual functional capacity.  (Plaintiff's Motion at 1).  In particular, Plaintiff cites Dr. Siddiqi's opinion "that Segovia was disabled due to his seizure disorder and hepatitis."  (Plaintiff's Motion at 10).  To the contrary, however, the written decision shows that the ALJ considered the evidence related to Plaintiff's seizure disorder and Hepatitis C, as well as a number of other impairments, in determining RFC.  (Tr. at 16-17).  Further, as detailed earlier, the ALJ's treatment of Dr. Siddiqi's opinion was appropriate under the governing law.  In his decision, the ALJ specifically addressed both the seizure disorder and Hepatitis C, and stated that the record shows that Plaintiff has "never required treatment" for Hepatitis C.  (Tr. at 14).

Plaintiff also complains that the ALJ failed to give proper consideration to Segovia's testimony that his medications make him drowsy, and that he has to take a nap once a day.  (Plaintiff's Motion at 11; Tr. at 45-47).  There is no evidence, however, that Plaintiff complained to his doctors about such matters.  And, Plaintiff's testimony about his daily activities, his difficulty sleeping at night, and his desire to get a full-time job suggest that these allegations are not entirely credible.  (Tr. at 17, 44-46, 52).  The Fifth Circuit has upheld credibility determinations in those instances in which the medical evidence or the claimant's daily activities contradict the claimant's subjective complaints.  *See, e.g.*, *Griego v. Sullivan*, 940 F.2d 942, 945 (5th Cir. 1991).  Further, an ALJ is not required to explore possible disabilities that Plaintiff did not allege in his disability application, or which are not addressed by the medical evidence.  *See Leggett*, 67 F.3d at 566.  In this case, Plaintiff has not shown that the ALJ erred by failing to consider all of his alleged impairments.

### *Alleged Conflicts Between Vocational Expert's Testimony and the DOT*

Finally, Plaintiff contends that the ALJ erred by "fail[ing] to explain or resolve [alleged] conflicts" between the testimony of the vocational expert and the Dictionary of Occupational Titles. (Plaintiff's Motion at 1). Specifically, he claims that some of the job options suggested by the vocational expert witness require a higher level of "reasoning" ability than the ALJ asked about in his hypothetical questions. (*Id.* at 12). Plaintiff does not provide further explanation, however, or cite any authority on this issue. (Defendant's Response at 10-11). Additionally, Plaintiff admits that the job of "office cleaner" falls within his RFC. (Plaintiff's Motion at 11-12). The vocational expert witness testified that there are a significant number of "office cleaner" jobs available in the national and regional economy. (Tr. at 18, 76). In fact, at the hearing, Segovia testified that he was working as an office cleaner, and that DARS was helping him find another cleaning job that might be a full-time position. (Tr. at 44-52). Moreover, Plaintiff's attorney did not raise any concerns about Segovia's "reasoning" ability in connection with the cited jobs when he cross-examined Rapant. (*See* Tr. at 76-79). The Fifth Circuit has held, as follows:

> Claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing.

*Carey*, 230 F.3d at 146-47.

In any event, the Fifth Circuit has concluded that "neither the DOT nor the vocational expert testimony is per se controlling." *Id.* at 147. The court held that, instead, "the pertinent issue ... is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs." *Id.* Here, even if a conflict exists

between the testimony and the DOT, the record contains substantial evidence that Segovia is capable of performing at least some of the identified jobs.  Plaintiff has not shown that there is a reason to remand the case based on these circumstances.

### Prejudice

As a final matter, even if there were flaws at the administrative level, Plaintiff has not shown that he suffered any prejudice as a result.  *See id*. at 142.  It has long been established that, even if an ALJ errs, his decision will not be disturbed unless the complaining party was prejudiced by the error.  *See id.*; *Ripley*, 67 F.3d at 557; *Kane*, 731 F.2d at 1220.  In a social security benefits case, to establish prejudice, "a claimant must demonstrate that he or she 'could and would have adduced evidence that might have altered the result.'"  *Carey*, 230 F.3d at 142 (quoting *Kane*, 731 F.2d at 1220); *see Ripley*, 67 F.3d at 557.  Here, Plaintiff has simply not shown that he "could and would have adduced evidence" that might compel the ALJ, on remand, to find that Segovia is, in fact, disabled, as defined by the Act.  *See Carey*, 230 F.3d at 142; *Kane*, 731 F.2d at 1220. As a result, Segovia has not demonstrated that he has been prejudiced by any of the ALJ's actions or omissions. *See id*.  For that reason, the court recommends that Defendant's motion for summary judgment be granted, and that Plaintiff's motion be denied.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's cross-motion for summary judgment be **GRANTED**, and that Plaintiff's cross-motion for summary judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1).  Failure to file written objections within the time period provided will bar an aggrieved

party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 2nd day of March, 2012.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**